# Mitchell *et al. versus* The Commonwealth, for the Use of Lucas.

*What Words constitute a Lease.—Sale and Delivery of Chattels.—Partial Payments.—Sheriff's Liability to Plaintiff in Execution.—Substance of Evidence must accompany the Offer.*

1. A written contract between parties, containing stipulations for holding the premises for a "term" of three years, for keeping up the machinery at the expense of the lessees, and for surrendering them, "at the termination of the contract," in as good order as the same now are, natural wear and tear excepted, was held to be a lease, and not a contract of bailment for hire, though it stipulated that the lessees should have the premises "rent free," and the only consideration *reditus*, or return, was the price at which the landlord was to have the privilege of purchasing the premises.

2. Where the lessor agreed to purchase and pay for lumber to be "manufactured, run, and delivered at Pittsburgh, the sum of $7 per M., to be paid for and counted by the measurement at the place where the said boards and lumber are sold," the title to the lumber was not to vest in him until delivery, and a seizure of the interest of one of the lessees, near the mill, and a subsequent sale by the sheriff, passed to the purchaser the entire title to the interest sold.

3. Receipts for partial payments by the lessor, unaccompanied by delivery, were only evidence of advancements for which he had no lien, and were properly rejected.

3. If, after seizure and levy at the suit of the plaintiff, the sheriff permit the property to be "run off or eloigned," he or his sureties are liable to the plaintiff for the debt, interest, and costs in his execution, if the property was of so much value.

5. This court cannot say that it was error to reject an offer to give evidence "going to show" that the execution was issued for the purpose of detaining

[Mitchell *et al.* *v.* The Commonwealth, for the Use of Lucas.]

the lumber levied upon by the sheriff, and not for the purpose of having the interest of Corley (one of the lessees) disposed of in satisfaction of the plaintiff's judgment, unless the testimony proposed to be given—or the substance of it—is set forth, and shown to be material to the issue. If the offer was made, as is stated in the paper-book, it was properly rejected.

ERROR to the Common Pleas of *Jefferson county.*

This was an action of debt brought on the official bond of T. S. Mitchell, late sheriff of Jefferson county, in the name of the Commonwealth, for the use of B. F. Lucas.

On the 19th of April 1856, B. F. Lucas, Esq., entered up a judgment in the Common Pleas against William Corley for $1500, and on the same day an execution was placed into the hands of Sheriff Mitchell, who levied on " all the interest and claims of William Corley of, in, and to eleven and one-half rafts of white pine boards, lying in Sandy Lick Creek, and twelve old cables," all which was placed in the care of Joseph S. Deering by the sheriff or his deputy, Samuel Craig. There were other writs of execution out at the time, amounting to about $1000, and the same property had been levied on under them, and advertised for sale on the 23d of April 1856.

On the day after the levy on Lucas's execution, Deputy Sheriff Craig directed Deering to deliver the cables and the rafts to one J. Ellicott, by whom they were removed out of the county. On the 23d of April, but after the property had been removed, the sheriff, by one of his deputies, sold it under an older *fi. fa.* than that of Lucas, for $192, part of which went to discharge the writ under which it was sold, and the balance was paid into the court.

The plaintiff, Lucas, then brought this action on the sheriff's official bond, alleging that the interest of Corley in the property levied upon was more than sufficient to satisfy the judgment if it had remained in the county until the day of sale, and been fairly sold, and assigning as one of the breaches that the defendant had fraudulently permitted it to be run out of the county, and beyond his bailiwick.

The pleas were " *nil debet*," &c., to which were afterwards added the pleas of " *non est factum*," and " performance with leave," &c.

The defence was that Corley had not such an interest in the lumber levied upon as was subject to levy and sale on the execution of Lucas; in support of which the following article of agreement was offered in evidence, and admitted by the court, under objection:—

" This agreement, made and concluded this 19th day of January, A. D. 1855, by and between D. B. Rouse and William Corley, the borough of Brookville, county of Jefferson, and state of Pennsylvania, of the first part, and F. D. Lake, of the same

borough, county, and state aforesaid, of the second part, Witnesseth: That the said D. B. Rouse and William Corley doth hereby agree, and bind themselves to stock and saw and run and manufacture boards and lumber on the two saw-mills belonging to the said F. D. Lake, situated on the waters of Sandy Lick Creek, in the township of Knox, county of Jefferson, and state of Pennsylvania; known as the Lake Mills for the term of three years to commence from the 1st day of February, A. D. 1855. The said D. B. Rouse and William Corley binds themselves to keep the mills running in the sawing and manufacturing of boards and lumber, day and night, when there is water sufficient to do business in making lumber upon the water-mill, and the steam-mill is to be kept running at all times when in order, and can be so run as not to do an injury to its machinery, the said D. B. Rouse and William Corley binds themselves to saw and manufacture good merchantable lumber, and to raft and run the said lumber and boards so manufactured on said mills at the spring and summer freshets, when there is sufficient water for running lumber, and deliver the same to said F. D. Lake or his agent at the drawing wharf at Allegheny or Pittsburgh as said Lake or his agent shall direct. The said Rouse and Corley is to keep the mills in good repair at all times and to supply and keep up all and every machinery and fixtures in and about said mills at their own proper cost and charges. The said Rouse and Corley is to have the privilege of stocking said mills from the lands owned by said Lake as follows: Of the mill lots in Knox township, Jefferson county, and of a tract or lot of land contracted for in the name of U. Spencer, and another tract, a lot contracted for in the name of Bell, both of which tracts lying and being in Clearfield county, Pennsylvania, on the waters of Falls Creek. The said Rouse and Corley binds themselves to take all the sound timber from said tracts clean as they go, and to commence at the one side of the tract, and not in any case to cull the timber; and they are not to cut or stock from the mill lots, or tract on Sandy Lick Creek, unless there is not sufficient water to float and drive logs from the Spencer and Bell lots. And the said Rouse and Corley bind themselves to keep a good supply of saw logs at all times at the mills, and the said Rouse and Corley is to have the use and occupancy of all the houses, stables, and outhouses, with the cleared land attached to the said mills free from rent or charge. The said Rouse and Corley is to pile the boards and lumber in neat piles so as not to injure or spoil. The said Rouse and Corley is to saw and manufacture the lumber and boards in such thicknesses as said Lake shall direct, and to make all the clear stuff they can out of the logs as sawed, and to pile, stock, and raft, and run said clear stuff by itself, and it is expressly agreed and

understood that, if at any time the said Rouse and Corley shall fail to keep the mills running, and to have a sufficient number of logs at the mills to cut and saw, all said mills will or can possibly cut for the space of three days, then, and in that case, this contract shall be at an end, and said Lake has the right to enter and take possession of the same, with all the lands and appurtenances to said mills and premises.

"In consideration of which the said Lake binds himself to pay the said Rouse and Corley the sum of seven dollars per thousand feet for each and every thousand feet of boards and lumber manufactured, run, and delivered at Pittsburgh or Allegheny by said Rouse and Corley from said mills, to be paid for and counted by the measurement, when run and measured at the place when said boards and lumber is sold, the money to be paid as follows: Three dollars on each and every thousand feet when piled, at the end of every month, and one dollar on each and every thousand feet when rafted in and when sufficient water for running lumber to market. And a sufficient amount of money when the boards and lumber is delivered to said Lake at Pittsburgh or Allegheny to pay off the hands running said lumber, not to exceed two dollars on each and every thousand feet so run and delivered, and the balance of what shall remain of the seven dollars per thousand when the boards and lumber is sold, drawn, and measured. The said Lake binds himself to put the mills in good repair by the 1st day of February next 1855, except the arch in the steammill which he is to build under in or before the 1st day of May next 1855. The said Rouse and Corley agree to take all the saw logs the said Lake has in the creek and on the bank, and to pay him the sum of thirty-two dollars and fifty cents per hundred logs for each and every hundred logs, and to pay for the same out of the money that shall be coming to them, on the stocking, manufacturing, and running the boards and lumber at the summer freshet in 1855. It is further agreed that all culled boards that shall be cut on said mills, shall be equally divided, half and half to each party at the mills, which shall be in full consideration for the timber and manufacturing of the said lumber and boards. The said Lake agrees to take what logs and stock the said Rouse and Corley shall leave at the end of this contract at the sum or price of thirty-two dollars and fifty cents per hundred logs, and the said Lake reserves the right that if he shall see fit at any time to furnish land on which timber is as on the Spencer and Bell lots, the same as convenient as the said lumber that said Rouse and Corley shall stock from said lands so purchased, and not stock further from the Spencer and Bell lots, and at the termination of this contract the said Rouse and Corley shall deliver up the property in good order and repair as it now is, natural

[Mitchell *et al. v.* The Commonwealth, for the Use of Lucas.]

wear and tear excepted.   Witness our hands and seals this day
and year above written.

Witness,                              D. B. ROUSE, [L. S.]
        S. B. BISHOP.                 W. CORLEY,  [L. S.]
                                      F. D. LAKE,  [L. S.]"

The defendant also offered to prove "declarations of the
plaintiff, *going to show* that the execution issued by him was for
the purpose of detaining the lumber levied upon by the sheriff,
and not for the purpose of having Corley's interest disposed of
in satisfaction of his judgment;" which offer was objected to,
and rejected by the court.

Defendant then offered "receipts of money by William Corley
to F. D. Lake, to show that all of the interest that Corley had
in the lumber was paid for by Lake, prior to the execution;"
which offer was objected to, and rejected by the court.

Several points were presented by the defendant, and answered
by the court, to which, and to the general charge, exception was
taken.

The portions of the charge objected to by defendant are set
forth in the assignments of error.

Under the instruction given by the court, the jury found in
favour of the Commonwealth, $7000 debt, and six cents costs,
and for B. F. Lucas, $1835.62 debt, and six cents costs.   Judg-
ment having been entered on the verdict, the defendant sued
out this writ, and assigned for error the following matters, to
wit :—

1. The court erred in refusing to permit the defendant to
prove declarations of plaintiff going to show that the execution
issued by him was issued for the purpose of detaining the lumber
levied upon by the sheriff, and not for the purpose of having
the interest of Corley disposed of in satisfaction of plaintiff's
judgment.

2. The court erred in rejecting receipts for money of W.
Corley to F. D. Lake, to show that all of the interest that Cor-
ley had in the lumber was paid for by Lake prior to the execu-
tion.

3. The court erred in answering the defendant's first point in
the negative, which point is as follows: "The court are requested
to instruct the jury that the interest of William Corley, the
defendant, in execution No. 108, May Term, A. D. 1856, was
not such an interest in the lumber seized as would be the
subject of levy and sale upon execution, and therefore the plain-
tiff is not entitled to recover."

4. The court erred in answering the defendant's second point
in the negative, which point is as follows: "That the amount of
money payable to Corley for running said lumber was not due,

[Mitchell *et al. v.* The Commonwealth, for the Use of Lucas.]

but depended upon labour to be performed about said lumber, which, not being performed, no lien for said amount could attach; and, as to that amount, the plaintiff would not be entitled to recover."

5. The court erred in answering the defendant's third point in the negative, which point is as follows: "That the amount of money to be paid Corley under the contract, after sale of lumber, was no lien upon said lumber, and, as to that amount, the plaintiff would not be entitled to recover."

6. In answering the defendant's fifth point, which point is as follows, "That the plaintiff can recover for no more than the balance of Corley's interest in the lumber levied after deducting the amount of writs previously placed in the hands of the sheriff"—the court erred in that part of said answer which declares that Corley's interest was the whole of it.

7. The court erred in charging the jury: "But, upon an examination of the agreement between Lake and Corley, we are of opinion that it does not avail the defendant, because under it there was a lease and possession of the lumber, and only a covenant on the part of Corley, to deliver it at Allegheny at seven dollars per thousand. We think under that article the sheriff's vendee would have taken the property, discharged of any claim on the part of Lake. Lake did not reserve the ownership by the lease, nor the right to the immediate possession, and, in order to give him a lien, it was necessary that he should have had the possession, or that Corley should have been his agent or bailee, neither of which positions is established by the lease. We are therefore of the opinion that if the property was eloigned or carried out of the county after the levy, with or without the consent of the sheriff, that the defendant is liable for all of the damages thereby sustained by the plaintiff.

*Jenks, Gordon,* and *Marshall,* for the plaintiff in error (defendant below), argued—1. The offer in the first· assignment was, to show an attempt on the part of the plaintiff below to use the process of the court for an illegal purpose, and should have been received: Dorrance *v.* Commonwealth, 1 Harris 160; Weir *v.* Hale, 3 W. & S. 285.

2. The receipts were evidence that Corley had been paid for his interest in the lumber, before the execution issued; and if so, he had nothing that could be taken under it.

3. The errors assigned in the five last specifications, are based on the construction which the court gave to the agreement between Rouse, Corley, and Lake. The "interest and claim" of Corley was levied on. Corley was not a lessee of Lake, but

held under a contract to run the mill, at a certain price per thousand: Pierce *v.* Sweet, 9 Casey 151.

The sheriff should not be held for more than defendant's interest was sold for: Commonwealth for Irvin *v.* Contner, 9 Harris 266.

*White, Campbell,* and *Lamberton,* for defendant in error.—1. The offer of evidence "going to show," was too vague and indefinite; nor was any one named to whom the alleged declarations were made; and, besides this, the sheriff's liability was fixed by his return, which cannot be affected by the plaintiff's declarations.

2. The receipts were rightly rejected: they were for lumber delivered previous to 1856.

3. The construction given to the agreement was correct. Corley, having purchased his partner's interest, was sole owner of the term.   The contract was a lease, and not a bailment for hire.

He was a tenant of Lake's, and, in the spring of 1856, owned the eleven and a half rafts of lumber that were levied on; to which Lake, even if he had paid the $7 per thousand, could have no title until they reached Pittsburgh, where they were to be delivered.   The entire title was in Corley: Jenkins *v.* Eichelberger, 4 Watts 123; Clow *v.* Woods, 5 S. & R. 275; Welsh *v.* Bekey, 1 Pa. Rep. 57; Herron *v.* Fry, 2 Pa. Rep. 263.

The case of Pierce *v.* Sweet is not in point; it gives a lumberman only a lien for his labour.   A levy having been made, the plaintiff had a right to a sale; and it is no defence to say that there has been no sale: Miller *v.* Commonwealth, 8 Barr 294; Hall *v.* Galbraith, 8 Watts 220.

The opinion of the court was delivered by

THOMPSON, J.—If the learned judge of the Common Pleas was right in his interpretation of the written contract between Rouse & Corley of the one part, and Lake of the other, it is not necessary to discuss certain other questions raised in the case.   He was of opinion that it was a lease of the mills, dwelling-houses, and appurtenances, with a privilege of stocking the mills with logs from certain described timber lots of the lessor, the compensation or rent for which, was to be found in the rate at which the former was to sell the manufactured lumber to the latter.

That a tenancy may be created, and exist, when the agreement of lease is that no rent shall be demanded or paid, cannot be doubted.   What might well be said of a mere possession given without a reservation of rent, is a different thing.   The objection here is, that the agreement stipulates that the contractors Rouse & Corley shall hold the premises "rent free."   While this does

not for this reason destroy the relation of landlord and tenant, it certainly goes far to prove it. It shows that the parties intended a tenancy, although without the ordinary payment of rent as such. The *reditus* or return was evidently provided for in the price at which the landlord was to have the right of purchasing the proceeds of the premises—the lumber to be manufactured by the lessees. This was all right, and contravenes no rule of law that I am aware of. This was a mode of compensation which the lessor chose to look to, and he must have intended to take the risk of it. That the contract was a lease is further evident in the stipulations for holding the premises for the "term" designated as three years—for keeping up the machinery at the proper cost and expense of the lessees, and for surrendering the premises at the "termination of this contract," "in as good order and repair as they now are, natural wear and tear excepted." This is wholly inconsistent with the idea contended for, that the contract was one of hiring, or a bailment for hire or reward. That it was not so is further apparent in the stipulation of Rouse & Corley, to "stock, saw, run, and manufacture boards and lumber, on the two saw-mills" of Lake, mentioned in the agreement. They were to do this at their own expense; and, as very convincing proof of it, agreed to pay the lessor at the rate of $32.50 per hundred for logs in the creek and on the bank and there at the commencement of the contract, and to receive the same for such as might remain unmanufactured at the end of the term.

In addition to all this, the lessor agreed to purchase and pay for the lumber to be "manufactured, run, and delivered at Pittsburgh," the sum of $7 per thousand, "to be paid for and counted by the measurement at the place where the said boards and lumber are sold." These are clear terms to evince ownership, and as clear of an agreement to buy and sell, with time and place of delivery and terms of payment fixed. The transaction can only be interpreted by the intention manifested in the contract, where they express a clear and unambiguous idea. The timber the lessees were to have the privilege of taking from the lands of the lessor, and from which the lumber was to be manufactured, was evidently to be paid for in the price at which the manufacturers were to sell the lumber. It was no less a sale in this form, than if bought by the log. In the one case there was simply to be a reduction in the price of the manufactured article equivalent to the value of the raw material; in the other, if paid for in cash by the makers to the lessor, they would add the sum so paid to the price of the lumber, and thus the lessor would pay it back again. It was a sale in either case; and for convenience the former method was adopted, and it was the right of the parties so to do. Without discussing the matter further, we have no doubt

that the contract was in substance and effect a lease, and consequently the relation between Corley and Lake, that of seller and buyer as to the lumber. The court was, therefore, right in so ruling. The facts of the case are altogether unlike those of Pierce *v.* Sweet, 9 Casey 151. That was a clear case of bailment—this was not.

It follows, then, that the lumber would not vest in Lake, until a delivery according to contract, and that a seizure of it as the property of Corley, at and in the neighbourhood of the mills, and a subsequent sale of it by the sheriff, would pass the entire title to the purchaser. If, therefore, after a seizure. by the sheriff, and levy on the writ of the plaintiff, he permitted it to be run off or eloigned with or without his assent, he must be accountable to the plaintiff to the extent of the debt, interest, and costs of his execution, if the property was of so much value. That it was so, the jury have found. If he was thus in default, his sureties, however hard the case may be, must answer for it if he is not able to do so. The relation of the parties being that of vendor and vendee, and the property remaining in the possession of the former and not vested in the latter until delivery at Pittsburgh, receipts for partial payments made by the latter, were but evidence of an advancement for which he had no lien on the property; and hence, even if the offer had shown them to be evidence, they would not have changed the plaintiff's right to a recovery. The receipts, however, are not set forth in the bill of exceptions; and the defendant in error positively denies that they were given for payments of the lumber in question, but that on their face they would show payment on lumber previously sold and delivered. Under this state of the exception, we cannot say who is right or who is wrong. But they were inadmissible, it seems to me, for another reason. They were receipts of a third party, who might have been a witness. They were not evidence *per se,* and no better than his unsworn declaration would have been. But, as we have seen, the clearest proof of partial payment on account would not have availed here. There was no delivery of the lumber accompanying it, and the possession and property remained in Corley and was subject to be seized and sold as his.

There is no doubt but that the plaintiff might, by intermeddling with the writ after it had gone into the sheriff's hands, or by such conduct as would be sufficient to justify a jury in inferring that it was not his *bonâ fide* intention to have the property seized to satisfy his debt, have postponed his right to recover more than nominal damages. If it was proved that he did not design to have the property seized and holden, he could not complain that he was injured by a result that he desired to bring about; and this was what was decided in Dorrance's Adm'rs.

[Mitchell *et al. v.* The Commonwealth, for the Use of Lucas.]

*v.* The Commonwealth for use, 1 Harris 160, and in Weir *v.* Hale, 3 W. & S. 285. But here the testimony proposed to be given is not set forth, and we have no means of judging of its tendency to prove the fact alleged. The offer was to give evidence "going to show that the execution was issued for the purpose of detaining the lumber levied upon by the sheriff, and not for the purpose of having the interest of Corley disposed of in satisfaction of the plaintiff's payment."

It is not possible for us to say that there was error in the rejection of evidence, without we are permitted to see it for ourselves. We cannot take the word of the party that it would have had a given effect, in a case in which the clearest proof would have been required to have the effect. He must show it to us, in substance at least, before we can convict the court below of error. It was not so done here, and the offer in this form we condemned in Williams's Adm'rs. *v.* Williams, 10 Casey 312. It is not stated to whom the declarations proposed to be proved, were made, whether to the sheriff, to his deputies, or to a stranger, or when or where. Can we say that they were such as should have been admitted? Peradventure they may have been made, if made at all, and never communicated to the sheriff till after the property was eloigned. If so, they would not have been sufficient to have controlled the mandate of the writ, and no tendency to prove what was contended for. We must presume this to be so, until the contrary is shown. The party alleging error must prove it. That has not been done here, and we must affirm this judgment.

Judgment affirmed.