376 A.2d 999

Joseph PAGANO and Virginia Pagano, h/w and Arnold Pagano, Appellants,

v.

REDEVELOPMENT AUTHORITY OF the CITY OF PHILADELPHIA, Appellee.

Superior Court of Pennsylvania.

Argued Dec. 11, 1975.

Decided June 29, 1977.

Lewis Kates, Philadelphia, for appellants.

J. Paul Erwin, Jr., Philadelphia, and White & Williams, Philadelphia, submitted a brief for appellee.

Before WATKINS, President Judge and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

SPAETH, Judge:

This is an appeal from the denial of a motion to take off a compulsory non-suit in a trespass action. The theory of the action is that the relationship between appellee and appellants was that of landlord and tenants, and that as a landlord, appellee violated the duty of care owed to its tenants.[1] The question presented is whether the lower court erred in concluding that as a matter of law appellants had failed to prove that they were tenants.

I

Appellants Virginia and Joseph Pagano and their son Arnold, lived from 1956 through 1969 in a second floor apartment at 3711 Spruce Street in Philadelphia. From 1955 on, the family operated a restaurant in an adjoining building, 3713 Spruce Street, known as "Campus Joe's."

1. Appellants' argument on appeal is couched in terms of "condemnor" and "condemnee." Since appellants must prove that they are tenants in order to qualify as condemnees, see The Eminent Domain Code, Act of 1964, Special Sess., June 22, P.L. 84, Art. II, § 201(2), as amended 1971, Dec. 29, P.L. 635, No. 169, § 1, 26 P.S. § 1–201(2) (Supp. 1976), and Comment thereto, we have found it easiest to discuss the case in terms of "landlord" and "tenant." The lower court did likewise.

Both premises were rented: the restaurant was rented from the owner of 3713 Spruce Street, and the apartment from the primary tenant of 3711 Spruce Street, Charles Zahn, who operated a haberdashery known as the Varsity Shop on the first floor. The Paganos entered their apartment from an outdoor stairway at the rear of 3711 Spruce Street. The Varsity Shop could be entered through a front or rear entrance, and did not provide access to the Paganos' apartment.

In 1965, appellee, the Redevelopment Authority, entered into a loan and grant contract with the federal government to obtain the funds necessary for condemnation in the University City Urban Renewal Area. A Declaration of Taking that included 3711 and 3713 Spruce Street was filed in Common Pleas Court in September, 1966. However, the Paganos continued to occupy both the restaurant and the apartment, paying their rent for the restaurant to the Redevelopment Authority and for the apartment to Mr. Zahn. They planned to move the family restaurant business, as well as their residence, to an enlarged facility at 3910 Chestnut Street at a future date.

Beginning perhaps sometime in 1968, the occupants of the 3700 block of Spruce Street began relocating their residences and businesses. Mr. Zahn moved to a new location in June, 1968, terminating his lease with the Redevelopment Authority, leaving the first floor of 3711 Spruce Street, where the Varsity Shop had been, vacant. The Paganos remained in the apartment above the vacant store with the knowledge and consent of the Redevelopment Authority. They did not pay any rent for the apartment, nor did the Authority ask them to pay any.[2] They did, however, continue to pay suppliers for heat, gas and electricity for the apartment.

2. On direct examination, Mrs. Pagano was asked "[D]id anybody from the Redevelopment Authority ever request of you that you were . . . that you should pay rent for the apartment 3711 Spruce St.?" She answered: "No, because we did not pay our rent to the Redevelopment Authority . . . No, they didn't." (R. 330a–331a)

Soon after Mr. Zahn moved out, the Paganos began to observe vandalism in the vacant store. Arnold Pagano testified that he constantly saw "people just going in looking for something of any kind of value that could be used, anything in general, whatever they felt could be used . . . ." (R. 43a) On one occasion, Joseph Pagano caught an employee of the Redevelopment Authority carrying out the water meter for his own personal use. (R. 166a–168a) Occasionally Joseph Pagano heard noises at 2:00 a.m. and went downstairs to investigate. (R. 171a) Virginia Pagano also testified to illegal activities:

> At first there was a lock on the door. Well, shortly after that, when people see that there is a vacant place in the neighborhood, they just—they don't waste any time breaking in. They break in, and they start taking shelving. They take whatever is available. So on different occasions, I myself made at least 5 or 6 phone calls . . . It was from time to time as we would see people in there. If I'd see them, I would call. If the waitresses would see them, they called. If my husband would see them, he called. I mean whoever would catch these people in there would make phone calls.
>
> (R. 251a–252a)

Despite these many reports, the Redevelopment Authority did nothing effective to secure the vacant store.

On the afternoon of June 10, 1969, a fire started in the vacant store. Arnold Pagano, who was resting in the apartment, was severely burned, and most of the furniture and clothing in the apartment was destroyed. At trial, Fire Marshall Stevens testified that the fire was "a slow buildup type of fire" (R. 125a), and that "[b]ased on [his] investigation of the physical spread of the fire, considering the time that the fire started from [his] opinion and the spread, [he] arrived at the fact that the fire was started—also taking into consideration the cigarette butts in the immediate area—by a carelessly discarded cigarette." (R. 138a)

The Paganos' action in trespass against the Redevelopment Authority was tried before a jury on June 11 and 12,

1973. Following the presentation of the Paganos' evidence, the Authority's motion for a compulsory non-suit was granted. On June 14, 1973, counsel for the Paganos filed a motion to take off the non-suit. On December 24, 1974, the lower court denied the motion, explaining the reasons for its decision in a careful opinion, which has been of considerable assistance to us in arriving at our own decision.

## II

### A

The decision of the lower court turns upon the court's conclusion that "at best" appellants' relationship to appellee was that of tenants at sufferance. Thus the court states:

> Plaintiffs [appellants] . . . lost their status as [sub]tenants when Mr. Zahn vacated the premises and the lease between him and the Authority [appellee] was at an end. Since [appellants] were not in privity of estate with [appellee] and only derived their rights, whatever they were, whether lawful or unlawful subtenants, from Mr. Zahn, when his right ceased, so did theirs. [Appellants] made no effort to lease or pay rental for the apartment they continued to occupy, although they did lease and pay rental for the adjacent restaurant building to the defendant. They became at best tenants at sufferance: persons who obtained the property lawfully, but who remained in possession without legal claim after lawful title was lost or terminated [citation omitted]. Such persons differ from a trespasser only in that they entered by permission of the owner, and they acquired no lessee's rights and no fixed term, remaining in possession due to the neglect of the owner to disturb him [citation omitted].

Lower Court Opinion at R. 494a–95a.

Because of this conclusion the lower court determined that appellee owed appellants only the lesser duty owed by a land owner to licensees, under Restatement (Second) of Torts

§ 342 (1965), rather than the stricter duty owed to tenants, under § 361.[3]

This determination was dispositive, for licensees may not recover if they "have reason to know of the condition and the risk involved," § 342(c), and appellants' evidence disclosed that they did know of the conditions that they claim led to the fire.

■ In reviewing the lower court's conclusion regarding the nature of the relationship between appellants and appellee, we are bound by principles both well-established and stringent: Non-suit should be entered only in a clear case; any conflict in the evidence must be resolved in the plaintiff's favor; and the plaintiff must be given the benefit, first, of all of the evidence favorable to him, and second, of every reasonable inference of fact arising from the evidence. *Perciavalle v. Smith*, 434 Pa. 86, 252 A.2d 702 (1969); *Finnin v. Neubert*, 378 Pa. 40, 105 A.2d 77 (1954). Having reviewed the evidence in the manner required, we agree with appellants that, contrary to the lower court's conclusion, the jury might reasonably have found that after Mr. Zahn moved out of the Varsity Shop, the relationship between appellee and appellants was that of landlord and tenant, and that as

**3.** § 342 of the Restatement provides:
A possessor of land is subject to liability for physical harm caused to licensees by a condition on the land if, but only if,
(a) the possessor knows or has reason to know of the condition and should realize that it involves an unreasonable risk or harm to such licensees, and should expect that they will not discover or realize the danger, and
(b) he fails to exercise reasonable care to make the condition safe, or to warn the licensees of the condition and the risk involved, and
(c) the licensees do not know or have reason to know of the condition and the risk involved.
§ 361 provides:
A possessor of land who leases a part thereof and retains in his own control any other part which is necessary to the safe use of the leased part, is subject to liability to his lessee and others lawfully upon the land with the consent of the lessee or a sublessee for physical harm caused by a dangerous condition upon that part of the land retained in the lessor's control, if the lessor by the exercise of reasonable care
(a) could have discovered the condition and the risk involved, and
(b) could have made the condition safe.

landlord, appellee violated its duty to appellants, as set forth in § 361 of the Restatement, to maintain "that part of the land retained in the lessor's control" in a safe condition. Accordingly, we hold that appellants' motion to take off the non-suit should have been granted.

This court summarized the principles governing the creation of leases in *Lasher v. Redevelopment Authority of Allegheny County*, 211 Pa.Super. 408, 236 A.2d 831 (1967). *Lasher* was the owner of the property in question. He had bought it from Charles and Mary Crichley in 1957. However, Charles Crichley remained in possession of the property in order to conduct his lumber business there. In 1964 the Redevelopment Authority condemned the property, but Crichley continued to remain in possession, and to conduct his business, for two more years. Crichley never paid any rent to Lasher, nor did he sign any lease. Because the method to be used for computing business dislocation damages under § 609 of the Eminent Domain Code, Act of June 22, Special Sessions, 1964, P.L. 84, 26 P.S. § 1–609 (Supp. 1976), depends on whether a lease existed, that was the issue for decision. We said:

> A lease embraces any agreement, whether express or implied, which gives rise to the relationship of landlord and tenant. *Smith v. Royal Ins. Co.*, 111 F.2d 667, 671, 130 A.L.R. 812 (9th Cir. 1940); Trickett, Landlord & Tenant, (Stern Ed. 1950). . . . A tenant is one who occupies the premises of another in subordination to the other's title and with his assent, express or implied. The agreement may be in writing or parol and the reservation of rent is not essential to the creation of the landlord and tenant relation. *Wilson's Estate*, 349 Pa. 646, 647, 37 A.2d 709, 710 (1944). . . .

The facts plainly show that Crichley remained in possession of the land after he had conveyed to Lasher with Lasher's consent either express or implied. This was sufficient to constitute a landlord and tenant relationship. The agreement under which this relationship existed constituted a lease within the above definition.

*Id.*, 211 Pa.Super. at 412, 236 A.2d at 833.

In the passage from *Wilson Estate* thus cited, our Supreme Court said that "[a]lthough the payment of rent is a usual incident of a tenancy, the reservation thereof is not essential to the creation of the landlord and tenant relation," although when the existence of that relation is at issue, as it is here, "the fact that no agreement is shown with regard thereto becomes an important circumstance." 349 Pa. at 649, 37 A.2d at 710.

In *Nakles v. Union Real Estate Co.*, 415 Pa. 407, 204 A.2d 50 (1964), the Court did not require a written lease in order to find that a tenancy at will existed:

We have held on many occasions that the mere formality of reducing an agreement to a writing when not accomplished will not destroy the agreement, if the agreement does not fall within the Statute of Frauds. [Citations omitted.] The evidence in this case indicates a meeting of the minds by the parties . . . . Union's acceptance of the check, the mailing of the lease and Aberman's letter to Delp are all indicative of an agreement which merely awaited the formality of being reduced to writing. Thus, under the Pennsylvania Statute of Frauds, Act of March 21, 1772, 1 Sm.L. 389, § 1, 33 P.S. § 1, a tenancy at will, if nothing more, was created.

*Id.*, 415 Pa. at 410–411, 204 A.2d at 51.

Here the lower court called appellee's "knowledge or notice of the continued occupancy of the apartment in 3711 a fact which is controverted." Lower Court Opinion at R. 495a. However, in making this statement the court failed to view the evidence in the light most favorable to appellants. When the evidence is viewed in that light, it is clear that appellee both knew that appellants were in residence and accepted their presence for a defined term. Arnold Pagano testified that an agent of appellee had visited the apartment approximately six times in 1969 to hear the family's complaints about vandalism. (R. 44a–45a) Joseph Pagano testified that on one occasion he caught an employee of appellee taking the water meter for the building and reported the

man to his supervisors, who then discharged him. (R. 166a–169a) Virginia Pagano testified that she spoke with officials of appellee on several occasions to request extensions of time for the family's move:

A. We went—my son and I, my younger son and I—went to see Mr. Cavanaugh and Mr. Turci, and we had quite a discussion, and, finally, they agreed to let us stay until—because, we had nowheres to go, not even the apartment wasn't finished. Where were we going to go? Where were we going to move?

Q. Were any of the Redevelopment Authority representatives present in your restaurant the day of the fire?

A. Yes, It was about—I was just fixing the cash register. We opened the door at 11 o'clock, but lunch wouldn't start until about 12. So, we would open—the doors were open. It was about between 11:30 and a quarter to 12, when Mr. Cavanaugh and Mr. Turci, and there was at least another man or two, but another man for sure. I don't know. I didn't know the other gentleman. And, he was a little perturbed about us being there yet. He says, "What are you doing? You are holding up the block." I said, "Well, Mr. Cavanaugh, what are we supposed to do?" I says, "Our place isn't finished. We have no place to go." I said, "We need a few more weeks until we are ready to—the place is ready for us to move into."

So, then, he went in the kitchen and talked to my husband. I guess he told him the same thing. By the time he walked out, it was right close to 12, and that was that.

(R. 253a–254a)

In our view, these facts are sufficient to create more than the tenancy at sufferance found by the lower court.

 This is not a case like *Mack v. Fennell*, 195 Pa.Super. 501, 171 A.2d 844 (1961), where a tenant continued to occupy premises leased on a month-to-month basis after she had received a notice of termination from the landlord.

There we explained the applicable principles of law as follows:

> When the tenant *unlawfully* remained in possession subsequent to the expiration of the term, the landlord could elect either to collect rent for the occupancy or to deal with the occupant as a trespasser and seek damages. When a tenant holds over at the end of the term, he becomes a tenant at sufferance, though the lessor has the option to treat him either as a trespasser or as a tenant for an additional term. If he is treated by the landlord as a tenant for an additional term, the tenant is liable for use and occupancy for the interval between the termination of the lease and the election of the lessor to treat him as a trespasser. . . .

*Id.,* 195 Pa.Super. at 504, 171 A.2d at 845 (emphasis added).

There is no allegation of any unlawful act on the part of appellants, as there was in *Mack v. Fennell, supra,* and also in *Routman v. Bohm,* 194 Pa.Super. 413, 168 A.2d 612 (1961). While it is the landlord's option to treat a "holdover tenant" as a tenant for a term or as a trespasser, *Emery v. Metzner,* 191 Pa.Super. 440, 156 A.2d 627 (1959); *Peterson v. Schultz,* 162 Pa.Super. 469, 58 A.2d 360 (1948), once the landlord has exercised that option and made his choice, he is bound by it. *Emery v. Metzner, supra.* Here, the actions of appellee were entirely consistent with its having entered into a lease with appellants for a definite term ending at the time of appellants' relocation. Since this view of the evidence is the view most favorable to appellants, they are entitled to it.

■ The lower court relied on *Sharp v. Luksa,* 440 Pa. 125, 269 A.2d 659 (1970), but that case is different from the present case. There the plaintiff had entered into an oral lease with the defendant for the use of a stall, tack room, and pasture for his horse, in exchange for a monthly rent. After the beginning of the term of the lease, plaintiff was permitted to use the loft in the barn to store hay, but no additional rent was charged. The plaintiff was injured while climbing to the loft on a ladder, which the plaintiff

had used often and knew to be "shaky" and "wobbly." In denying recovery under § 361, the Supreme Court said:

Plaintiff was a gratuitous licensee—the right given him to use the ladder and the loft, not being a part or provision of the lease, was solely for his accommodation, benefit and convenience, and not in any way for the benefit of the defendant. There was no proof of any latent or concealed defect or of any affirmative negligence, or of any dangerous condition known to defendant and unknown to plaintiff.

440 Pa. at 129, 269 A.2d at 660.

Here, however, a reasonable inference from the evidence offered by appellants is that there was a "benefit" to appellee. By "benefit" we assume the Supreme Court meant some substitute for rent, for in the cases finding a lease despite the lack of rent it appears that there was some alternative return to the landlord, e. g., "a mutually advantageous arrangement with [the landlord] respecting purchase and storage of lumber," *Lasher v. Redevelopment Authority of Allegheny County, supra,* 211 Pa.Super. at 410, 236 A.2d at 832, or "the price at which the landlord was to have the right of purchasing the proceeds [milled lumber] of the premises," *Mitchell v. Commonwealth for Use of Lucas,* 37 Pa. 187, 194 (1860). Here, appellee might well have valued appellants' presence on the property, as tending to keep the building in relatively decent condition until the entire redevelopment area was ready for razing. Appellants in effect acted as watchmen, as perhaps most clearly shown by Joseph Pagano's testimony regarding the occasion when he caught an employee of appellee taking the water meter. In addition, appellants paid for heat, gas, and electricity in at least their part of the building. Also, appellee might have deemed the rent for the adjoining restaurant premises sufficient recompense for appellants' occupancy of both properties. It may be that the jury would not have drawn these inferences, or that the inferences would have been dispelled by appellee's evidence. However, as the record stands now, they are reasonable inferences, and appellants are entitled to their benefit.

## B

Appellee also argued, and the lower court held, that appellants had assumed the risk of the dangerous condition of the premises when they remained there with knowledge of the condition.

 Accepting *arguendo* the conclusion that assumption of risk, like its close cousin contributory negligence, is applicable to § 361, see Restatement (Second) of Torts § 361, Comment *a* and § 360, Comment *b*, still the motion to take off the non-suit should have been granted.

We conceive the rule as to assumption of risk to be the same as the rule as to contributory negligence, *i. e.*, that the pertinent inquiry is whether the plaintiff's negligence appears so irrefutably from the evidence in his own case that to permit a jury to absolve him in the circumstances would be to elevate caprice over legally conclusive fact. . . . [C]ontributory negligence may be adjudged as a matter of law only in clear cases where the facts are indisputably fixed and there can be no reasonable doubt as to the inferences properly to be drawn from them [citation omitted]. Or, as was stated in *Virgilio v. Walker and Brehm*, 254 Pa. 241, 244–245, 98 A. 815, 816, "* * * a nonsuit can be entered only when it is inconceivable, on any reasonable hypothesis, that a mind desiring solely to reach a just and proper conclusion in accordance with the relevant governing principles of law, after viewing the evidence in the light most advantageous to the plaintiff, could determine in his favor the controlling issues involved."

*Sargeant v. Ayers*, 358 Pa. 393, 397, 57 A.2d 881, 883 (1948).

We cannot conclude that this test has been met here. The testimony shows that appellants' apartment was intact and well-cared for. The acts of vandalism that took place in the premises below involved such conduct as theft of shelving and of a water meter, and overnight stays by trespassers. These do not demonstrate "irrefutably" that there was such

a danger as fire that appellants appreciated. Perhaps if there had been a previous fire and yet appellants had remained, we might agree that as a matter of law the risk was clear and appellants had assumed it. As the evidence stands now, however, the questions of the existence of risk and whether appellants voluntarily assumed it should be for the jury. *See Graham v. Reynoldsville Borough,* 132 Pa.Super. 296, 298, 200 A. 681, 683 (1938); Restatement (Second) of Torts § 496D, Comment *e.*

## C

One further point may be noted.[4] If on retrial the relationship between appellants and appellee is found by a jury to be that of tenants and landlord, the lower court will have to apply the rule of § 361 to determine whether appellee was "subject to liability to [its] lessee . . . for physical harm caused by a dangerous condition upon that part of the land retained in the lessor's control." Were it clear that appellee had no responsibility for the area where the fire began, our lifting of the non-suit and remand would be a pointless exercise. However, we do not think it is clear.

When the conditions of § 361 have been met, our courts have consistently found liability. The law is clearest in cases involving "common areas" such as steps or passageways. Thus, in *Leary v. Lawrence Sales Corp.,* 442 Pa. 389, 392, 275 A.2d 32, 34 (1971), the following principle was stated:

> In Pennsylvania, it has long been established as a principle of landlord-tenant law that where the owner of real estate leases various parts thereof to several tenants, but retains possession and control of the common passageways and aisles which are to be used by business invitees of the various tenants, the obligation of keeping the common aisles safe for the business invitees is imposed upon the landlord and not upon the tenants, in the absence of a

---

4. We have not considered all of the issues argued to us, for our disposition of those that we have considered makes that unnecessary.

contrary provision in the lease or leases [citations omitted] . . . .

See generally *Smith v. M.P.W. Realty Co., Inc.*, 423 Pa. 536, 225 A.2d 227 (1967) (radiator); *Gaynor v. Nagob*, 204 Pa.Super. 258, 203 A.2d 525 (1964) (steps and bannister); *Lemmon v. Bufalino*, 204 Pa.Super. 481, 205 A.2d 680 (1964) (exterior steps); *Portee v. Kronzek*, 194 Pa.Super. 193, 166 A.2d 328 (1960) (interior steps).

The situation here, where the premises under the (assumed) landlord's control that have not been safely maintained are not "common areas," is more difficult. However, we are not without guidance.

In *Pratt v. Scott Enterprises, Inc.*, 421 Pa. 46, 218 A.2d 795 (1966), the owners of the building had exclusive possession of the basement. The plaintiff, an employee of the prior tenant of the first floor, fell through the floor into the basement. He sued the landlord, the new tenant, and his employer. The landlord argued that the evidence had failed to establish its responsibility for the plaintiff's injuries. The landlord had leased the first floor first to one glass company, then to a second, and then entered into an oral sub-lease with the plaintiff's employer for a short period of time. The Court said:

> Anyone who is injured in a building where he has the right to be, as a result of the negligence of the landlord who is not out of possession and is in control, is not required to grope his way through a labyrinth of lease and sub-lease provisions with their thickets of verbiage, in order to reach a determination of the issue of responsibility for the mishap which caused his accident. The brute fact in this case is that Scott [the landlord] had exclusive possession of the basement and it had the duty of maintaining it in a safe condition.

*Id.*, 421 Pa. at 48–49, 218 A.2d at 796.

Thus, where a landlord has exclusive possession of part of a building, he may be liable to the employee of a sub-tenant injured in a different part of the building.

In *Germansen v. Egan*, 130 Pa.Super. 21, 196 A. 881 (1938), a landlord rented part of her first floor to a company for which the plaintiff worked. The landlord herself retained space for carrying on a business in back of the rented premises. The upper floors were leased by the landlord to different tenants. The landlord also used the roof, which contained a skylight with a cracked pane of glass, to collect and carry away rain water; apparently the skylight extended over both the leased and retained premises. The plaintiff was injured when the cracked pane collapsed because of snow. We said:

> The rule laid down by the Supreme Court in *Harris v. Lewistown Trust Co.*, 326 Pa. 145, 191 A. 34, 110 A.L.R. 749, in our opinion, cannot be applied here. It is confined to cases where the landlord rents an entire building to a tenant, retaining no possession or control over any part of it. It does not apply where the landlord rents different parts of a building to different tenants and himself occupies part of it. In such case the landlord remains in possession and control of the building, except those portions specifically leased to tenants.

> 130 Pa.Super. at 25, 196 A. at 882.

The present case is not like *McAuvic v. Silas*, 190 Pa.Super. 24, 151 A.2d 662 (1959). There, the plaintiff leased one-half of a double dwelling from the defendant. From the date of the lease until the date of the accident, the plaintiff, with the defendant's permission, used the adjoining tenant's back porch to hang clothes. The plaintiff was injured when the porch railing broke. On her appeal from the lower court's refusal to take off a compulsory non-suit, we affirmed the principles discussed *supra*, saying that

> [a] landlord of a multiple tenanted building, having control of sidewalks, common approaches, passageways or parts of the building common to all tenants, becomes liable where he either had actual notice of the defective condition therein, or was chargeable with constructive notice. [Citation omitted.]

> 190 Pa.Super. at 27, 151 A.2d at 663–664.

We then went on to hold that the porch was not a "common" or "retained" area:

In the present case the defendant did not retain control of any portion of 1317 Wyoming Avenue . . . .

. . . . .

If no oral lease existed for the porch, then the relationship of landlord and tenant did not exist, and the plaintiff entered upon the premises solely for her own purpose as a licensee.

*Id.*, 190 Pa.Super. at 27–28, 151 A.2d at 664.

██ Here, however, the vacant Varsity Shop was not leased to anyone once Mr. Zahn left. Therefore, under long-standing principles of landlord-tenant law, the unoccupied store was appellee's responsibility; the fact that no agent or employee of appellee was physically present is not controlling. *Toth v. Philadelphia*, 213 Pa.Super. 282, 247 A.2d 629 (1968).

Reversed, and remanded for new trial.

PRICE, J., files a dissenting opinion.

PRICE, Judge, dissenting:

I would affirm the entry of compulsory non-suit on the excellent opinion of the lower court.